CENTRAL BANK & TRUST CO. OF HOUSTON v. WIESS et al. (No. 6603.)†

(Court of Civil Appeals of Texas. Galveston. April 21, 1914. Rehearing Denied Nov. 12, 1914.)

1. CONTRACTS (§ 92*)—VALIDITY—INSANITY—CAPACITY TO PROSECUTE BUSINESS.

When an issue of insanity arises collaterally, on the determination of the quality of the party's civil act as valid or invalid, the question is whether, by reason of mental disease, the party was unable to comprehend the nature of the act, its relations, effect, and legal consequences; it not being necessary, to entitle one to avoid his contracts on the ground of insanity, that his incapacity be so great as to dethrone his reason, or to amount to entire want of reason, but it is sufficient if he is so insane as to be incapable of understanding the subject of the contract, its nature and probable consequences.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 411–414, 1153, 1155; Dec. Dig. § 92.*]

2. EXECUTORS AND ADMINISTRATORS (§ 221*)—INDORSEMENT OF NOTE—INSANITY OF INDORSER—EVIDENCE.

In an action to establish a note as a claim against the estate of an indorser, evidence *held* to require a finding, as a matter of law, that the indorser had sufficient mental capacity at the time he indorsed the note to bind himself by his contract of indorsement.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 901–903½, 1858, 1861–1863, 1865, 1866, 1871–1874, 1876; Dec. Dig. § 221.*]

Error to District Court, Jefferson County; John M. Conley, Judge.

Action by the Central Bank & Trust Company of Houston against Byron Wiess and others, as administrators of Mark Wiess, deceased. Judgment for defendants, and plaintiff brings error. Reversed and rendered.

C. R. Wharton, of Houston, and L. B. Hightower, of Beaumont, for plaintiff in error. Barry & Burges, of Beaumont, and Carlton, Townes & Townes, of Houston, for defendants in error.

McMEANS, J. Plaintiff, Central Bank & Trust Company of Houston, brought this suit upon a promissory note for $10,000, executed by William A. Grant to plaintiff, dated December 28, 1909, bearing interest from maturity at the rate of 8 per cent. per annum, and providing for 10 per cent. as attorney's fees, and alleging that the note was guaranteed by Mark Wiess. Mark Wiess died before the filing of the suit. The note as a claim against his estate had been presented to the administrators, Byron Wiess and Tom Andrus, who refused to allow the claim, and thereafterwards this suit was filed. No judgment was sought against Grant; it being alleged that he is actually and notoriously insolvent.

The administrators resisted the suit on the allegations that the deceased, Mark Wiess, at the time of the execution of said note was, and for a long time prior thereto had been, of unsound mind and incapable of making a binding contract; that one F. E. Pye, knowing this to be a fact, and knowing that his mind had become enfeebled, had begun, long before the execution of said note, to assiduously associate with and cultivate said Wiess, to the end that he might gain his confidence, and thus be enabled to use him and his name for his own selfish purposes; that Pye succeeded in getting the confidence of said Wiess, and was an officer of plaintiff bank, and had induced said Wiess to execute the note sued on for his benefit.

At the beginning of the trial the defendants made admission that the plaintiff had a good cause of action as set forth in the petition, except in so far as it might be defeated in whole or in part by the facts of the answer which might be established on the trial, and assumed the burden of proof and the right to open and conclude. A trial before a jury resulted in a verdict and judgment for the defendants, and plaintiff has appealed.

[1] Appellant by its first and second assignments of error complains of the refusal of the court to give its requested special charge to the jury peremptorily instructing a verdict in its favor; it being contended by appellant that the undisputed proof shows that the deceased, Wiess, at the time he indorsed the note, understood the nature and probable consequences of the act. The circumstances in which the note in question was signed are substantially these; Wiess and Pye together made quite a number of real estate deals, buying property jointly and selling at a profit. They occasionally indorsed each other's notes; the evidence showing that Pye had indorsed at least two notes for Wiess, one for $20,000, and the other for $10,000, on which Wiess had obtained the money. About the time Wiess indorsed the note in question, Pye had become indebted to plaintiff bank, for borrowed money, in quite a large amount, which the bank was pressing him to reduce. In order to comply with the bank's urgent request in this regard, Pye induced William A. Grant to execute his note to the bank for $10,000 to discharge to that extent his indebtedness to it, and procured Wiess to guarantee, by his indorsement, the payment thereof. Grant executed this note as a matter of accommodation to Pye. When Wiess indorsed it, or soon thereafter, Pye gave him a writing in which he agreed to protect Wiess against any liability by reason thereof. Wiess had great confidence in Pye's honesty and business judgment, and resented any question of, or reflection upon, his integrity or business capacity.

The following facts with reference to Mark Wiess, his mental history, habits, and eccentricities, are established by the undisputed evidence: He was at the time of his death 67 years of age, was born and had been reared in Jefferson county, and was a twin broth-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Application for writ of error pending in Supreme Court.

er of William Wiess, a well-known citizen of Beaumont, living at the time of the trial. Early in life he had owned timber, and had been in the lumber business at one time. He had been in the mercantile business and had failed. For a great many years he had dealt in real estate, which appears to have been a hobby of his. He had bought and sold real estate in New York City, St. Louis, Beaumont, Houston, and other places, covering a period of 15 or 20 years. He had always been a very eccentric man; was extreme in his religious views; did not believe in the orthodox religion; had never done so; was extreme in his political views; was what might be called an unreconstructed rebel, and, as far back as 15 or 20 years ago, would become violent in a discussion of politics, and insulted if an offer was made to present him to an officer wearing the uniform of the regular army; was an extremist on the prohibition question, and believed if prohibition carried the country would be ruined. He was a self-willed, obstinate, hard-headed man. When his doctor told him he thought he should not eat certain foods, these were the foods he would prefer to eat and would eat. When his family would try to keep him from borrowing money, or getting in debt, they would have conflicts with him. He would be very much irritated, and say he knew how to attend to his own business. He resented and became very angry at the slightest interference. During the last few years of his life he was afflicted with Bright's disease, and it was this malady that finally killed him. He, however, remained active, going about attending to his own affairs, entirely without assistance, until he took to his bed in May, 1910, about 60 days before his death. "Up to that time he had always attended to his affairs in his own peculiar way. He would not take dictation from anybody, and would not take kindly to suggestions even." "Up to the time of his last illness he kept his account with the bank and drew checks to manage his affairs." Prior to 1902 Wiess had bought real estate in Houston, and about that time he began to buy there again, rather extensively, and would be in Houston often in connection with his real estate matters. He bought what is known as the old Porter homestead in that year, and sold it at a considerable profit. He bought another piece of property, which he later sold to the Ineeda Laundry at a profit, and made several investments which turned out quite well. He continued his real estate investments in Houston up to the time of his death, and invested very heavily during the last two or three years of his life, both in Houston and in Beaumont. The undisputed evidence shows that both of these cities were steadily advancing during this time, and great profits were to be had in real estate investments advantageously made. Wiess' most intimate friends never considered his judgment good in real estate.

During the period from about 1907 until 1909 and 1910, one F. E. Pye was dealing extensively in real estate in Houston, and was currently reputed to have made a fortune in these dealings. During all this time there was a continuous boom in real estate in Houston, and everybody was talking of big profits. It was commonly reputed that Pye had made a half million dollars. Mr. Wiess began dealing with him, buying and selling real estate through him. Pye's investments were usually of a successful character, and in those in which Wiess joined with him they frequently made good profits. When the Central Bank & Trust Company was organized in 1908, Wiess was a stockholder, and subsequently became a director, and was a director in December, 1909, and was elected and qualified as director again in 1910. Pye was its president.

The testimony shows that Wiess, who in his earlier married life was greatly devoted to his wife, had undergone a revulsion of feeling toward her. One night shortly before his death he became greatly angered at his wife because of her refusal to sign a deed conveying her homestead, her separate property, and cursed her, telling her that she had blocked every move he had made for years, and threatened to kill her and himself. He then left home, declaring he would never return, but did return the next day, and said nothing of what had transpired the night before. At times he would talk loudly, changing the subject of his remarks quickly, and frequently at such times would get excited and gesticulate wildly. Toward the last he became faded, worn, weak, very much emaciated, and forgetful. His son V. Wiess committed suicide on March 30, 1909, and this had a very depressing influence upon his mind. He charged himself with being the cause of his son's death, and suffered great remorse by reason thereof. After V. Wiess' death he took a great fancy to V.'s young son, and carried the child everywhere with him, talking to and playing with it in such a way as to frequently annoy others in whose place of business he might be. At one time he developed a fantastic, but impracticable, notion of building a business house to consist of many rooms for shops, all of which would open into a court, and had the plans drawn, but he failed to buy the ground he wanted to build upon and let the notion drop. Much testimony along this line was introduced, and the witnesses who testified to the many eccentric acts and ideas of Wiess also testified that their opinion, based on what they knew of him and of his conduct covering a period of time extending a year or more prior to his death, and embracing the time of indorsing the note in question, was that he was of unsound mind. There was other testimony, however, going

to show, and to conclusively show, we think, that however eccentric, however foolishly, he may have talked and acted, and however wild his dreams of accumulating a fortune by land speculation were, his mind was not impaired to such an extent as to render him incapable of knowing what he was doing when he indorsed the note, or to understand and appreciate the legal effect and possible consequences of his act. He went to Houston frequently during this period, and transacted and discussed business matters with others than Pye. Among these were M. E. Foster, H. Masterson, Guy M. Bryan, and Judge E. P. Hamblen, who testified, in effect, that in their opinion he was mentally sound enough to understand ordinary business transactions. In a transaction with H. Masterson he contended with plausibility that he should receive a larger sum of money out of a business deal they had had together than Masterson was willing to concede, and in this conversation told Masterson that he was indorser on several notes for Pye, and mentioned two that he specially desired to be taken up, and gave as a reason why he should get more money out of the deal that he had to meet some of these notes. He specially mentioned two $5,000 notes held by Kiam. In the period from October 29, 1909, to January 15, 1910, he wrote Pye several letters on business matters, and these were introduced in evidence. These letters indicate that Wiess had a clear conception of the business to which they relate. In one of them he sent his note to the First National Bank for $20,000 for Pye's indorsement, and in another his note to Hutchings, Sealy & Co. for $10,000, also for Pye's indorsement. One of these letters, written only eight days before Wiess indorsed the note in question, and nearest in point of time, reads as follows:

"Beaumont, Dec. 20, '09.

"Dear Pye: Received letter from Judge Hamblen this evening in which he states that you paid $64,750 instead of $62,500 as you stated to me. Therefore the property cost $107,-250 instead of $105,000. Therefore, I am short $400.00 of paying for two-fifths. Therefore I inclose you check for $400.00 which would reduce your payment to $64,350 and increase mine to $42,900 making a total cost of $107,250 and give me two-fifths and you three-fifths. This will simplify matters. Therefore, kindly have the deeds read two-fifths and three-fifths. I will show you how we can double our money on our five-sixth of 511 Main street. It is too good to sell at any price. Please close deal tomorrow as I will need all the credit this will give me. I will be at least $125,000 ahead. Send me $2,500 or $5,000 if you can. I'll secure good as gold.

"Your friend,        Mark Wiess.

"I am mighty happy Pye. We are the biggest people in Houston. I have written Judge Hamblen as above."

The letter he refers to as having been written by himself to Judge Hamblen on the same date, and another also written to Judge Hamblen on the day before, are as follows:

"Beaumont, Dec. 19/09.

"Hon. E. P. Hamblen, Houston, Texas—My Dear Judge: Please find inclosed contract bet. Mr. F. E. Pye & myself which explains itself. I desire that you draw the deed for me, the matter is important as you will see but I have no suggestion to make to you, you will note that one of the interests from the girl that eloped with Sweeney and got married at Richmond is now in the name of the Pye Realty Co. but the deed is not recorded for reasons that Mr. Pye will give you. The two interests that Mr. Pye bought on Friday are in his own name but he will transfer them to the Pye Realty Co. then the Pye Realty Co. will make the transfer to me. Cast deed & in accordance with inclosed contract signed by Mr. Pye & myself. Kindly make a specialty of this Judge as tis vitally necessary for me to have this property in tangible form & greatly oblige.

"Yours faithfully.        Mark Wiess."

"Beaumont, Dec. 20/09.

"Hon. E. P. Hamblen, Houston—My Dear Judge: Yours of date just recd—The mistake was Mr. Pyes—as he stated that he paid 62500 to my 42500—making a total of $105,000—It seems he left out an item 2225.00 that he paid which added to the 105,000 makes an increased total of 107250—and would leave me short of $400.00 of owning a ⅖ interest—$400.00 added to 42500 makes a total of 42900.00 paid by me—42900.00 is ⅖ of 107,250.00

"Kindly use your best endeavor to close tomorrow as it is necessary to my financial affairs that it be shown that I have acquired valuable for cash.

"Your friend,        Mark Wiess."

Ray Wiess, a son of Mark Wiess, testified as follows:

"I did not know anything about this indorsement (for Pye) until along about the latter part of April or the first part of May, 1910. I think it was about the 13th or 15th of May that my father took to his bed. I did not find out about this indorsement until the last time he was in Houston. In going down with him from the street car to the house, he told me about this indorsement. He pulled out a paper written by Pye and signed by Pye and his wife, mentioning this indorsement, and that Pye had promised to pay certain notes when they were due and save him harmless. I forget how many there were in the list mentioned. He showed me a list of the indorsements he had given for Pye. My recollection is they amounted to $40,-000. There were three $10,000 notes and a $5,000 note. He said he came over to see Pye, and he pulled out this letter and let me read it; that is the first I knew about these indorsements, and he said it was all right; that those people for whom he indorsed were good people; he would have no trouble about it, but he was getting weak, and he wanted those things straightened out, and he wanted his name off of all those papers. I had a conversation about indorsements in Beaumont, when he was sick in bed. I think that further conversation was early in May, before he went to bed. I wanted him to let me place these matters in the hands of attorneys, and I told him I thought Pye was a crook. He thought it would cost too much money—Pye was all right. I had heard in Houston that there was a $5,000 note and a $7,500 note held by Neuhaus Bros. with Father's indorsement. I asked him about these notes because he didn't have them listed, and he said he didn't know anything about any such notes. He said he didn't know anything about these notes being out, and if there were such notes they were forgeries. So I went back to Houston and went to see Neuhaus Bros. and asked them to show me the notes. They showed

them to me, and when I came back to Beaumont and told Father about it, he said they were forgeries. I never criticized his business dealings. I was surprised, of course, that he was on those notes. I do not remember exactly what I said to him about it. I don't think I told him he might have them to pay. He said he wanted to be relieved of them—of his indorsements. He gave me a list of the notes he had indorsed for Pye when I was here in Beaumont. He voluntarily gave me that list. He didn't ask me to take the list. He had my sister write a letter giving a list, and told me about the Grant $10,000 note. He wanted me to see Pye and get these notes paid or renewed with some other indorser. He wanted me to do that right away. I could not attempt to repeat his exact words, but he did instruct me to see Pye, and either have these notes paid or renewed with other indorsers and leave him off. He knew where one or two of the notes were, and told me where I could find one or two. He told me one was in Brenham, one was at the Lumberman's Bank; that I would find the Perry note at the Lumberman's Bank. This was bothering him all the time of his last illness. He told me he wanted me to see Pye and tell him to carry out his promise. When I went back the next time, I discussed it with him, and told him I didn't think I could get Pye to do anything. He told me to go back. I don't know how many times I discussed that matter with him from that time to the time of his death. I suppose I discussed it every time I went there. Up to the last those indorsements were preying on his mind, worried him, and as often as I talked with him he asked me to see Pye about it, and I tried from time to time, and had no success."

The question to be determined is: Does the evidence show that Mark Wiess, at the time he indorsed the note in question, was insane to such an extent as to be incapable of comprehending or understanding the subject of the contract and its nature and probable consequences? If so, or if there was sufficient evidence to raise the issue, the judgment of the trial court must be affirmed. All the authorities are in substantial accord in holding that:

"When the issue of insanity arises collaterally—that is, upon the determination of the quality of the party's civil act as being valid or invalid—the question is whether, by reason of mental disease, the party was unable to comprehend the nature of the act, its relations, effect, and legal consequences." Buswell on Insanity, § 18.

Cyc. vol. 22, p. 1206, states the rule thus: "The mental defect or disease necessary to entitle one to avoid his contracts on the ground of insanity need not be so great as to dethrone his reason or as to amount to an entire want of reason, but it is sufficient if he is insane to such an extent as to be incapable of comprehending or understanding the subject of the contract and its nature and probable consequences. He must be insane at least to this extent; mere weakness of intellect not being enough."

The substance of this rule is recognized by all the authorities cited and relied upon by appellee. Thus in Lindly v. Lindly, 109 S. W. 467, the question was whether the mind of a person at the time of the execution by her of a deed was so impaired that she was incapable of understanding her property rights and the nature and legal effect of the deed. In Caddell v. Caddell, 131 S. W. 432, it was decided as a correct principle that a conveyance executed by one who at the time was laboring under such a degree of mental infirmity as to be incapable of understanding in a reasonable manner the nature and effect of the act he was doing was void.

In Edwards v. Davenport (C. C.) 20 Fed. 756, the rule stated in the earlier cases to the effect that, in order to set aside a contract upon the ground of mental incapacity, it must appear that there was a total deprivation of reason was rejected, and the more modern rule, that it is only necessary to show that the party executing the contract was of such weak and feeble mind as to be incapable of comprehending its nature, was approved. And so in all the other cases cited by appellee the same general rule is stated.

[2] Bearing in mind the general rule, does the testimony in this case show that the mind of Mark Wiess, at the time he indorsed the note of Grant, was so impaired that he did not know and appreciate the effect of his act and the legal consequences that might follow from it? Does the testimony of the witnesses who testified to his eccentricities, vagaries, strong self-will, intolerance, prejudices, forgetfulness, and quick temper prove that at the time he indorsed the note he did not understand the nature and legal consequences of his act? Are the opinions of these witnesses that he was insane, based upon their knowledge of these matters, sufficient to overcome positive testimony that he fully knew and comprehended what he was doing at the time? Does such testimony even raise the issue in the face of such positive testimony? It may be readily conceded that the conduct, words, and disposition of Wiess at times, as testified to by the witnesses for appellees, gave evidence of an unbalanced mind, and justified their conclusion that he was mentally unsound at some times and on some subjects. But when the concrete facts relating to the very act under consideration are looked to, we think that there is no room for any conclusion other than he fully understood and comprehended the nature of his act, and the probable legal consequences of indorsing the note at the time he indorsed it. We are not disposed to attach any greater weight to the testimony of the parties in Houston with whom Wiess had business transactions or discussed business matters, who testified that, in their opinion, he, at such times, was of sound mind, than that of others who testified that, in their opinion, he was not; for he might have been of sound mind at such times, and not so when he indorsed the note, just as he might have been of unsound mind at the times referred to by appellees' witnesses, and have been of sound mind when he indorsed the note. For the same reason we attach but little more, but some more, importance to the letters written by Wiess, hereinbefore referred to; their value in the main consisting of the apparent soundness of intellect of the writer in such close proximity of time

to the date of his indorsement, those copies having been written only eight and nine days, respectively, from the date of the indorsement. But the testimony that we think indisputably proved that Wiess was of sufficiently sound mind to bind himself by his indorsement, under the rule above stated, is as follows: Ray Wiess, the son of Mark Wiess, who says he always sustained amicable relations to his father, testified that he did not know of the indorsement for Pye until the latter part of April or the first of May, 1910; that his father took to his bed about the 13th or 15th of May, 1910; that when he found out about this indorsement his father was in Houston, and that in going from the street car to the house he told him about it, and—

"he pulled out a paper signed by Pye and his wife mentioning this indorsement, and that Pye promised to pay certain notes when they were due and save him harmless. * * * He showed me a list of the indorsements he had given for Pye. My recollection is that they amounted to $40,000. There were three $10,000 notes and a $5,000 note. He said he came over to see Pye, and he pulled out this letter and let me read it; that was the first I knew about these indorsements, and he said it was all right; that those people for whom he indorsed were good people; he would have no trouble about it, but he was getting weak, and he wanted those things straightened out, and he wanted his name off all those papers."

He further testified:

"He gave me a list of the notes he had indorsed for Pye when I was here in Beaumont. He voluntarily gave me that list. He didn't ask me to take the list. He had my sister write a letter giving a list, *and told me about the Grant $10,000 note.* He wanted me to see Pye and get these notes paid or renewed *with some other indorser.* He wanted me to do that right away. I could not attempt to repeat his exact words, but he did instruct me to see Pye, and either have these notes paid or renewed with other indorsers, and leave him off. He knew where one or two of the notes were, and told me where I could find one or two. He told me one was in Brenham, one was at the Lumberman's Bank; that I would find the Perry note at the Lumberman's Bank."

He further testified:

"This was bothering him all the time of his last illness. He told me he wanted me to see Pye and tell him to *carry out his promise.* * * * Up to the last those indorsements were preying on his mind, worried him, and as often as I talked with him he asked me to see Pye about it. * * *"

From the testimony of this witness, called to testify by the defendant, and who, as before stated, was the son of Mark Wiess, there is, in our opinion, no doubt that the deceased was sufficiently in possession of his mental faculties at the time he signed the note to understand and appreciate, and did understand and fully comprehend, the nature of his act, its effect, and the legal consequences. That he knew in so doing he incurred a legal obligation to pay the note is shown by his great anxiety to be relieved from liability, either by Pye's paying the note or having it renewed with other indorsers,

"leaving him off." However forgetful he may have been of other matters, he not only remembered all through the last two months of his illness that he had indorsed notes for Pye, but he kept a list of them, and had his daughter to draw a list of them for the use of his son Ray. Further, he remembered particularly the Grant note, involved in this suit, and told Ray about it. He even remembered where two of the notes could be found —one at Brenham and the other at the Lumberman's Bank. He remembered that Pye had promised to hold him harmless, and sent word to him to keep his promise. The fact of his indorsements preyed upon his mind and worried him up to the last. Why the worry, why should this prey upon his mind "up to the last," unless he was fully conscious of the nature, effect, and legal consequences of his indorsement? When other witnesses speak of his idiosyncrasies and eccentricities, the many seemingly foolish things he said and some that he did, and thereon base their conclusions that he was insane to such an extent as to not be capable of appreciating the legal effect of the act, the answer is that his conversations with his son Ray in regard to the particular act in question conclusively show that he knew what he was about, and indorsed the note with full comprehension of the fact that he thereby incurred the legal obligation to pay it, and that he was conscious of this obligation "up to the last." It is true that the evidence shows that he disliked to indorse notes for others, and to go in debt; but it is also true that the evidence discloses that he and Pye had indorsed notes for each other, and that Pye indorsed one note for Wiess for $20,000 and another for $10,000; and, however much Wiess may have disliked to indorse notes for others, it appears that, having been the recipient of favors of that kind at the hands of Pye, he did not feel himself in position to refuse when Pye called upon him for a like favor. There is no doubt that Wiess believed in Pye's honesty and had great confidence in his business sagacity, and while such belief and confidence were not justified in the light of facts subsequently transpiring, he then, no doubt, believed that Pye would hold him harmless against liability, but nevertheless he knew that in indorsing the note he was assuming liability.

In view of these conclusions, we are of the opinion that the court should have given the special charge requested by the plaintiff in error, peremptorily instructing the jury to return a verdict in its favor. This conclusion obviates the necessity of our passing upon the other assignments of error presented by the plaintiff in error in its brief.

Defendants in error do not contend that the verdict should be sustained on the ground of undue influence or fraud, and, if raised by the pleadings, such issues were not submitted to the jury.

The judgment of the court below is reversed, and judgment here rendered for the plaintiff in error.

Reversed and rendered.